Statement of the Case.
MONROE, J.
This is an action in damages for personal injuries, in which defendants admit liability, if plaintiff was injured, as alleged, but deny that he was so injured.
It appears, from the testimony, that on Wednesday, November 11, 1908, plaintiff boarded a train at Alton, to come to New Orleans, and took the rear seat, on the right side, with his face towards the engine, in the car next behind the baggage car; there being one passenger car, which was occupied, and two that were empty, behind that in which he thus seated himself. At Little Woods the train was run into from behind by another train. The three rear ears were badly smashed, and a number of passengers in the car next behind that occupied by plaintiff were killed and injured; but the car in which plaintiff was riding was wholly uninjured, as were also the occupants, save a small boy, who was standing near the water cooler at the moment of the collision, and, according to his account, the plaintiff, who says, in his testimony:
“I was knocked out of my seat and fell on the back of the seat in front of me, and rolled down into the aisle of the car. * * * Q. You were sitting in a straight position, were you? A. Yes, sir; sitting up straight in the car. * * * Q. You were knocked on top of the back of the seat and fell from there? A. Yes, sir. Q. On *296 what part of the body? A. Onto my stomach; I fell on the top of the back of the seat and then fell down in the aisle.”
' The car in question carried negroes, in the forward, and whites, in the after, part. Plaintiff testifies that he thinks there were two other white persons in the after part, but only one has appeared to testify. His name is J. W. Hartman, and he says: That he does not know whether there was any one else besides plaintiff and himself in the white compartment. That he was seated, when the collision occurred, with his face towards the engine. That the train was moving at the rate of, perhaps, 8 or 10 miles an hour. That the colliding train struck it in the rear. That the shock was not hard enough to knock him forward or even backward. That it did not throw him at all. That the (backs of the) seats of the car would strike one about the shoulders. That the seats, were covered with plush. That, in less than a minute after the shock, plaintiff jumped up and “hallooed”: “My God! An explosion!” And witness stood up too, and saw him standing. Did not see him fall. There was no shock sufficient to throw a man down. As soon as the train stopped, Peoples walked outside, and, a few minutes later, witness saw him walking around. He helped to get the body of a man who had been killed out of the wreck, lifting it. They, shortly afterwards, came on to New Orleans, in the same car, and talked to each other as they had talked at the scene of the collision. Peoples said nothing about being hurt. On the next evening witness met him on the train, returning, and asked him how he felt, and he complained of feeling badly, but made no complaint of having been injured in the collision.
There are said to have been five negroes in the forward compartment of the car, and two of them (Peter Jordan and Tom Johnson) have testified. Peter Jordan says: That he has known plaintiff for about five years. Was in (the forward part of) the same car with him at the time of the collision. Witness’ little boy was, just then, standing by the water cooler, and “it slammed him into the wall” (for which the railroad company paid him $100). Witness was also standing by the water cooler and was not thrown down. Witness thinks that Peoples Was standing up at the time. After the collision they got out and looked at the wounded — Peoples, Hartman, Johnson, and himself. No one else in the car in which he was riding, save his little boy, was hurt, so far as he knows. ■ .
Tom Johnson says he did not see Peoples until after the collision and they had left the oar. He was then walking around and made no complaint of being hurt. They came on to the city together, and Peoples got off the train, on their arrival, like any one else, without assistance.
Herbert Kelley was not on the train, but saw Peoples, just after the collision, walking around as usual. He did not look like a man who was hurt.
Plaintiff himself, says that, after being thrown onto the back of the seat in front of him and rolling into the aisle, he did not realize that he was hurt, and that he got up and, with the other passengers, went out of the car; that he spoke to Hartman and Jordan and walked about; that he looked around to see whether a friend of his had boarded the train, and saw the dead and wounded; that, when the necessary arrangements were made, he got into the same car and came on to the,city; that, on the way, he told Hartman that his back and stomach hurt him; that, on his arrival here, he went to Gapdau’s Drug Store and telephoned to his wife, whom he had left in Alton, after which he went about attending to the business for which he had come to the city; that he then rode in a street oar to his sister’s, where he dined, after which he again went to Capdau’s Drug Store and told Dr. Oapdau *298 that his stomach and back hurt him, whereupon Dr. Capdau gave him a prescription which was put up in two. bottles, the contents of one being intended for external, and of the other for internal, use. He appears to have spent the night at his sister’s, and he says that the next day his stomach began to swell, and two lumps appeared; that, in the evening, he returned on the train to his home at Alton, and did not thereafter leave his house until he went to consult Dr. Polk, at Slidell (the date of his visit being fixed by Dr. Polk, as Tuesday, November 17, 190S); and that since then he has been an invalid, unable to do any work and confined to his home, save for his visits to the doctor.
On the other hand, Peter Jordan says that he saw Peoples in Alton the day after the accident, or the next day, rolling a wheelbarrow — “making across the railroad track.”
Tom Johnson says that he saw him in Alton on the Saturday, following the accident, walking from his store to the post office as he always walked.
Wm. Mclvor, who was called as a witness for plaintiff, says that he saw him a few days after the accident on the freight platform.
John Alford, one of his own witnesses, says that he saw him walking about two or three days after the accident.
E. F. Holdsworth, one of his own witnesses, says that he saw him two or three times on the street a few days after the accident.
S. T. Cox, a witness for defendant, saw plaintiff on the street the day after his return to Alton. He was going to the station, with his wheelbarrow. On the Sunday following the accident, he was at the station waiting for the excursion train.
Plaintiff says that the witnesses are all mistaken, though no one corroborates his testimony to the effect that he was confined to his home until he went to see Dr. Polk.
It appears from the testimony of the physicians who were called as witnesses (three on behalf of plaintiff, and one on behalf of defendant) that plaintiff was suffering with physical troubles of different kinds, such as anaemia, mitral regurgitation, arterial sclerosis, “arcus senilis, due to old age,” and double, incomplete, direct, inguinal hernia, and that his general. condition was poor. The double hernia is the trouble that he attributes, more particularly, to the accident. He says that before the accident he had never been sick, and a number of witnesses, including one or two members of the Fire Patrol in New Orleans, with whom he was, at one time, associated, and several of his neighbors in Alton, testify that they never knew him to be sick; in fact, his wife and grandson attempted to get a certificate from his neighbors, generally, to that effect, but, for some reason, the idea was abandoned. Plaintiff mentions the names of several physicians, whom he had consulted in the course of his life, either for himself or his wife, including Dr. Oapdau; but, unfortunately, it turned out that they are all dead, so that defendants were unable to obtain any information from them.
It also appears that plaintiff left the Fire Patrol about 16 years before the date of the accident, and went to live at Alton, where he engaged in the grocery business, in a small way, selling charcoal, etc., and S. J. Oox testifies that, when Mrs. Peoples brought to Mm, for signature, the certificate to the effect that he (Peoples) had always been in good health, he told her he saw him “hopping about” and did not know what the matter was, to which she replied that it was corns, and that he did not tell her whether he would sign the certificate or not. To this may be added the testimony of an old negro by the name of Welch, who says that he has known plaintiff for about three years, and that he had always limped; that *300 after the collision he met him, coming from Slidell, and. remarked to him that he looked “tired and worried,” to which plaintiff replied that he had been jarred by the train. “He said,” to quote the language of the witness, “he was already ruptured, and, since the shock, the thing had dropped down. That is what he told me. * * * He didn’t tell me what dropped; he said it dropped down where he was ruptured. It got low; that’s all; that other part; I don’t know anything about it.”
Dr. Thibaut declined to express any opinion as to whether plaintiff’s hernia was of recent origin or long standing, as did, also, Dr. Polk. Dr. Yeazie seemed to think that it must have been as much as a year old, when he made his examination, but declined to say that it was two years old. Neither of the gentlemen mentioned were definite in their expressions of opinion as to whether if the hernia in question was caused by a blow, or impact, plaintiff would have suffered much pain at the time. Dr. E. Denegre Martin (called as an expert on behalf of defendants) examined plaintiff, on February 13, 1909, in the presence of Dr. Polk, and found him “thin, emaciated, and in general bad health, prematurely old.” He was very decidedly of the opinion that the hernia was of long standing, and gave his reasons (which, to the lay mind, appear convincing) at some length. He said, inter alia:
“There is only way of producing an abdominal hernia. That is, we must first understand that the abdomen is nothing more than a cavity containing the abdominal viscera; that it is lined by a solid substance, in the back, the spinal column, the ribs, and the pelvis. In 'the front, it is covered by muscles, which are more or less elastic. In order, therefor, to cause protrusion of any of the abdominal contents, the cavity must be compressed, either by the action of the diaphragm, * * * or by compression of the abdominal muscles, or by anything that would squeeze the abdomen so as to lessen its area. Being struck in the back, against the solid portion of the abdomen, could not, posssibly, cause a.contraction of the abdomen, and, besides, the abdominal viscera would have a tendency to go backward, against the solid wall, instead of forward. Furthermore, hernias, from direct violence, are rarely seen; only a few such, as from the kick of a horse, have resulted in that way; in other words, it would require a blow, somewhere in the neighborhood of the inguinal ring, of sufficient force to rupture the muscle — that is, causing temporary paralysis of the muscle and weakening the ring. * * * There never was, at any time, so Dr. Polk testified. (Objection.) There never was, at any time, any evidence of injury to the abdominal wall. It is possible, however, that a man of Mr. Peoples’ physical condition may have 'had a predisposition to inguinal hernia which would have remained in a more or less normal condition as long as the subject was in a fairly good health and would not interfere with him in the performance of his duties; but such a condition as I found showed a double rupture, absolutely symmetrical on both sides, with the ring large enough to insert both fingers direct and enough to enter the scrotum, which had existed for a long time — I would say, at least several years. And we know, from experience, that it takes many months to produce the thinned condition of the muscles which existed in his case when examined.”
Opinion.
In order that plaintiff should have been injured as he says he was, he must have been projected, from a sitting position, about two feet, or more, into the air, and forward, half the length of his body, since, otherwise he could not have fallen, upon his abdomen, across the top edge of the back of the car seat in front of him. But nothing that we know, or can imagine, of dynamics leads us to think that the impact, upon the car in which he was seated, of a blow from behind, could have produced any such remarkable effect. As against his testimony that it did so, which is, at once, wholly unsupported and, as it appears to us, at variance with all the probabilities, we have the testimony of two men who were in the same car, one of whom was on his feet at the moment of the collision, that the shock was not severe enough to have thrown a man down, or out of his seat; that plaintiff was not so thrown; and that when the car stopped he walked out, as did the other passengers, and made no complaint of injury. We have also the undisputed fact that the car was wholly uninjured. When to this we *302 add that plaintiff swore, positively, that he did not leave his house from the day he returned to Alton until he called on Dr. Polk, and that he is overwhelmingly contradicted in that respect by his own witnesses as well as by those called on behalf of defendants, it becomes evident that his testimony as to the effect produced on him by the collision cannot be accepted as establishing the first fact sought to be proved, and necessary to be proved, in order to make out his case. Although, therefore, it is abundantly shown that he is suffering from “double, incomplete, direct, inguinal hernia,” it no more appears that he acquired it through the fault of the defendants than that he, in that way, acquired the anaemia from which he also suffers, or the mitral regurgitation, or the arterial sclerosis, or the arcus senilis, and the defendants are no more responsible in damages for the one than for the other. We therefore conclude that the judge a quo properly rejected his claim.
It is accordingly ordered, adjudged, and decreed that the judgment appealed from be affirmed.